Hitchcock, C. J.
The questions raised in this case are important, being intimately connected with our common school system. The facts stated by the relators in their application to the court, are, in substance, admitted by the defendants in the return to the alternative mandamus. It admits that there is in the treasury of the city, the sum of $2,177.61, belonging to the eastern and western school districts of the city, for the use of common schools in those districts; at least it admits that the city treasurer received this amount of money from the auditor of the county for that purpose, but does not seem to be exactly willing to admit that it is in the treasury. The treasurer received it, and he received it as school money, belonging to the eastern and western districts, but he received it unwillingly, and instead of reporting it to the city council as so much money in his hands, he deposited it in the Franklin Branch, in Cincinnati of the State Bank of Ohio, at four per cent, interest, where the same remains, subject to judicial decision. It is stated in the return, that “ the treasurer was not willing to receive said money, supposing it was not proper for him to do so, and he would’ not have received it, except for the following reason, to wit: the county auditor refused to give him an order for the other school money, unless this was also included, and all receipt *189 ed for together.” This other school money which was thus ob tained, amounted to a much larger sum. It is further stated-in the return, that the bills referred to in the complaint, had been referred by the city council to the committee on schools. This committee reported, “ that the city treasurer has certain funds in his hands, purporting to have been assessed and collected for- the benefit of the common schools, but the legislature has made no provision to appropriate said fund; the committee, therefore, believe that the city council has no control over the subject.” Upon the whole return, the defendant “ prays the judgment of the court, whether the said sum of $2.177.61, has been legally levied and collected, and appropriated, as above set forth, and that the court will make such order in the premises, as shall be required by right and justice.”
It is claimed by counsel for the relators, that the return is evasi-ve, and that consequently they are entitled to a peremptory mandamus, and 1 Barb. Rep. 34 is cited as authority. This authority sustains the position assumed by counsel. ' The return, in the opinion of the court, is somewhat evasive, but as we understand it, the city council do not' intend to controvert the right of the two districts to this money, provided it has been “ legally levied and collected.” On this subject they have doubts, and refer the question to the court. They seem, further, to have doubts whether they have any thing to do in the business, or have any control over it. They have been advised by this “ committee on schools,” that they have no concern with it, and they want the opinion of the court upon the subject. Such seems to be the intention and desire of the city council. They do not complain that these eastern and western school districts of the city, are for the benefit of the colored children of the city. They are aware, as we all must be, that if education improves the white youth of the state, and better fits and prepares them to make useful citizens, education must better prepare the colored children to become useful inhabitants. There is nothing in the return to show that they have any feeling of *190 opposition to the education of colored youth. The only question in the mind of the city council seems to he, whether this money was properly levied and collected, and whether they have the right to interfere to give it the direction by law in tended, if the intention of -the law is, that it shall be appropri ated to the education of colored youth.
So far as the first question is concerned, neither the city council, in their answer, nor their counsel in argument, have pointed out wherein this money was levied and collected in violation of law. It was levied and collected under the same provisions of law that the larger sum referred to was levied and collected. So far as this latter sum is concerned, there is no complaint. It seems to be admitted that this was properly levied and collected. It was, without hesitation, received by the city treasurer, and rather than not receive it, he agreed to take the $2,177.61, although with respect to the propriety of the receipt of this latter sum, he had some conscientious scruples. If the levy and collection of this latter sum were illegal, the same objection applies to the former sum; so far as this matter is concerned, the same law applies to both. The two sums were collected together, as one gross sum, and after the collection, distribution was made by the county auditor. If any thing was wrong, it was this distribution, but of this there is no complaint. It is admitted that the apportionment was in exact proportion to the number of youth in these two complaining districts.
In order to determine whether it was proper for the city council to give this sum the direction intended by law, whether they had the power to interfere with it, and to draw orders for it upon their treasurer, as liabilities might be incurred by the districts, it will be necessary to give some little attention to our school laws, and especially to the act of February 10th, 1849, “ to authorize the establishment of separate schools for the education of colored children, and for other purposes.” (47 Ohio L. 17.)
In exainining this act I shall first consider the 6th section, which is the repealing section. After repealing certain laws *191 by their titles and dates, the section proceeds as follows: “ And all parts of other acts, so far as they enforce any special disabilities, or confer any special privileges on account of color, are hereby repealed, except the act of February 9th, 1831, re lating to juries, and the act of the 14th March, 1831, for the relief of the poor.” Now suppose there had been no other provisions in this act, what would have been the consequence, so far as schools are concerned ? Unquestionably, white and colored children must have been admitted into the same schools, and upon the same terms. There would have been no distinction on account of color. All would have an equal right of ad-mission, and all must have been admitted, unless the law was palpably violated and resisted. The eight hundred colored youth, and the thirty-three thousand white youth of Cincinnati would have been found in the same rooms, the same schools, under the same instructors, according to their locality in the different parts of the city.
In this state of case the colored youth of the city would have received precisely the same benefit from the school fund as is now claimed for them. By the general school laws, as they would have remained after this repealing clause, this right would have been secured to them.
But to avoid this difficulty of mingling in the same schools, youth of different colors, whites with blacks and mulattoes, the “ board of trustees and visitors of common schools of the city of Cincinnati, on the 17th August, in the year 1849, passed a resolution that the city should be divided into two school dis tricts, for the colored youth of said city, to be called the eastern and western districts.”
If the provision of the law authorizing this action is, as is contended by defendant’s counsel, unconstitutional and void, it follows of course, that the general law remains, securing to colored youth the right of attendance in common schools with white youth, and the right to participate in the school fund, for it will not be pretended that the repealing clause before referred to, is unconstitutional. They might be ex *192 eluded by force and violence, they could not be by the laws of the land, as it now exists.
The first section of the act of February, 1849, enacts, “ That the trustees of each incorporated township in this state, and the trustees, visitors, and directors of schools, or other officers, having authority in the premises, of each city and incorporated town or village, shall be, and they are hereby authorized and required, respectively, in case they shall not deem it expedient to admit the colored children resident in any such township, city, town or village, into the regular common schools therein established, to create one or more school districts, for colored persons, in every such township, city, town, or village, which district or -districts shall include all the territories thereof; and in laying off such districts, they shall be governed in all respects by the provisions of the act for the better regulation of common schools, passed March 7, 1888.”
Pursuant to the provisions of this section, the “ board of trustees and visitors of common schools of the city of Cincinnati ” accepted the resolution dividing the city into two districts for colored youth, before referred to. There is no complaint 'of want of power in this board to perform the act, nor is it pretended but that it was properly performed.
The second section of the same act provides, that when any district is established as prescribed in thfe first section, the authority establishing the same shall give notice to the adult male colored tax-payers residing in the districts, to meet and choose their school directors, “ and such meeting, and all subsequent meetings for the election of directors, and for other purposes, shall be held and conducted as is directed in respect to meetings for like objects, by act of March 7, 1838, and the acts amending the same, and the powers, rights,” etc.
In pursuance of this section, notice was given, and an elec tion held in the eastern and western districts of Cincinnati, and so far all appears to be right.
*193 The third section requires the authorities establishing separate districts to cause lists to be made of all colored taxpayers, and all colored youth over five and under twenty-one years of age resident therein, and to certify the same to the auditor of the county, who. is directed to preserve the same in his office.
This requisition was also complied with.
The same section next prescribes, “ that no property of any colored tax-payer within said districts, shall be charged with any special tax for district purposes, for the benefit of schools in any regular district, embraced wholly or in part of the same territory; and no property of any white person in any regular district, shall be charged with any such tax for the benefit of the schools in any separate district composed wholly or in part of the same territory.”
What is meant by a special tax in this connection may be easily ascertained by reference to the general school law of 1838, and the acts amendatory thereto, by the provisions of which acts these separate districts are to be controlled. These laws in fact constitute a part of this act. The only change is, that for the accommodation both of whites and colored persons, separate districts are instituted, including within their limits territory which has previously been, or subsequently may be* organized into regular districts. AI though these districts include the same territory, they constitute as distinct districts as if they were formed of separate and distinct territory. In regular districts the tax-payers of each must pay the special taxes of their own district, so in these separate districts. These special taxes are generally levied for the purpose of purchasing sites for school houses, and for building and repairing school houses. As to general taxation for school purposes, no discrimination is made as to tax-payers, whether they reside in one district or another, nor is any distinction made between colored tax-payers and others.
*194 The fourth section of the act is as follows: “ Every separate district, established as aforesaid, shall be held to include for school purposes, only the colored persons resident within its territorial limits, and from and after the establishment of the same, the colored youth resident therein, shall attend the schools organized under the directors of such district; and the powers and duties of county auditors, county treasurers, township trustees, township treasurers, district treasurers, and district clerks, and other officers in regard to such separate district, and the schools established therein, shall be the same as now are, or may be exercised or performed by said officers respectively, in relation to the regular districts, and the schools established therein, and said districts and schools shall in all respects, except so far as this act provides to the contrary, be governed by, and have the benefits of all the provisions of said act of March 7, 1838, and the amendatory acts, and all acts relating to schools in cities, towns, or villages, modifying the same.”
The eastern and western districts of the city of Cincinnati are located in that city, and under this section of the act, the law regulating schools in that city is applicable to these districts. Such was the intention of the general assembly, as evinced by the language used, and' such is the manifest spirit of the law.
It is unnecessary^to inquire at length as to the law regulating common schools in the city of Cincinnati. It constitutes a system peculiar to that city, a system which might not work well in the state at large. This system is prescribed by the act of March 1st, 1834, “ to establish and incorporate the city of Cincinnati,” etc. (32 Ohio L. 244.) By the 33d section of the act, it is provided that all money collected in said city for the support of common schools, as well as other school funds, shall be paid into the city treasury as a separate and distinct fund.
In pursuance of this provision, the money now in controversy was paid over by the auditor of Hamilton county to the treasurer of the city, as well as a greater sum which *195 had also been collected for school purposes. The two sums so paid over, had been collected of all the tax-payers of the city, without distinction of color. According to the apportionment made by the county auditor, the sum of $2,177.61 belonged to the eastern and western districts. This money is in the treasury of the city for the use of schools in those districts.
Now, how is this money to be drawn from the treasury ? Precisely as other money for like purposes is drawn from the treasury under the Cincinnati school system and the practice under that system. The treasurer cannot pay without an order from the city council, and as the foundation for such order “ the board of trustees and visitors of common schools ” certify to the city council the correctness of all accounts for expenses incurred for the support of said schools, and give certificates to teachers entitled to receive payment. This has been substantially done in the case before the court, and we do not understand that there is any objection to the payment of the claims ón account of informality. Nor is it contended that if these papers had been made by the “ board of trustees and visitors ” of the schools in the regular districts, they would not have been sufficient to lay the foundation for an order upon the treasurer for payment. I understand they are in the ordinary form used for the purpose of obtaining money from the treasury, when therein deposited for school purposes. Under these circumstances they must be held sufficient in the present ease. The relators are entitled to the money. The city council must make the necessary order for its payment. The return or answer is not sufficient to absolve or relieve them from this objection.
But it is claimed by defendants’ counsel, that this law of March, 1849, is in violation of the constitution of the state, and therefore null and void. Before this court will declare any law to be unconstitutional, that part of the constitution of the state with which it conflicts must be pointed out, and the discrepancy between the law and constitution clearly ascertained. So long as doubts remain, whether the law conflicts with the constitution, the law should be enforced.
*196 Certainly so much of the act of 1849 as operates to repeal " all parts of other acts, so far as they enforce any special disabilities, or confer any special privileges on account of color,” can hardly be said to be unconstitutional. The controversy heretofore has been whether the laws creating these disabilities, and conferring these special privileges, were in accordance with the constitution. Whether the general assembly could constitutionally deprive black and mulatto persons of the benefits of the .common schools of the state. Amid all this controversy, however, the question was never presented to this court in a shape that made it necessary for the court to pass upon it.
It is assumed by counsel for defendants that the office of school director is a public office, and as none other than a white man can, under the constitution, hold a public office, and as a school director of a separate school district for coloréd youth may be a colored man, therefore the law is unconstitutional. This law of 1849 does not say any thing as to the color of a person to be elected school director. It is silent upon that point. Undoubtedly, however, it was the intention of the framers of that law that colored persons might be elected directors. There is nothing, however, in the constitution prohibiting a colored person from holding such an office, if office it may called. Nor is it insisted that there is any such prohibitory clause. All that is said in that instrument upon the subject of schools is found in the 25th section of the bill of rights, which is as follows: “ No law shall be passed to prevent the poor, in the several counties and townships within this state, from an equal participation in the schools, academies, colleges and universities within this state, which are endowed, in whole or in part, from the revenue arising from donations made by the United States, for the support of schools and colleges, and the doors of , said schools, academies, and universities shall be open for the reception of said scholars, students, and teachers, of every grade, without any distinction or preference whatever, contrary to the intent for which said donations were made.”
*197 The whole subject of organizing and regulating schools is very properly left to the general assembly in the exercise of its legislative powers.
But although there is no such prohibitory clause, still it is insisted that this law, in the particular named, is in contravention of the spirit of the constitution. In my opinion, this is rather dangerous ground to tread upon in determining the constitutionality of a law. We may all agree as to the reading of the constitution, and generally as to its meaning, but when we contó to talk of its spirit, it is a different matter. There is great danger that we shall conclude that spirit to be in accordance with our preconceived opinions or feelings of what it ought to be. Counsel for defendants come to the conclusion • that the spirit of the constitution prohibits a colored man from being the director of a .school district for colored children. Another man, from reading the first section of the bill of rights, might be led to the conclusion that the spirit of the constitution required that all men should be placed upon an equal footing, except where that instrument expressly provided otherwise.
So far as the elective officers of the state, county, or townships are concerned, they must be white men. They can be elected only by white men. White men alone are legal voters at state, county, and township elections. Beyond this the constitution does not prescribe. Nor does it eyen go thus far with respect to all county and township officers.
Now a school director, although in some respects a public officer, is not even a township officer. He is merely the officer of a school district — a political organization unknown to the constitution — the mere creature of legislative enactment. And it seems to the court that the power creating the political organization might well define the qualification of its officers, if in so doing they do not violate any express provision of the charter under which they themselves act.
Another constitutional objection is, that these directors are elected by colored voters. The same reply may be made to this objection as to the former, nor do we see any thing in *198 either of these objections which would lead us to the con elusion that this law of 1849 is unconstitutional. But should we so hold, the only consequence would be, as before stated, to give to the colored youth of Cincinnati a right to enter the public schools of that city, and in that way participate in the benefit to be derived from the school fund. As a matter of policy it is unquestionably better that the white and colored youth should be placed in separate schools, and that this school fund should be divided to them in proportion to their numbers.
Without further remarks, we announce the opinion that the relators have made a case which entitles them to relief, and that the return or answer to the alternative mandamus is insufficient. A peremptory mandamus will therefore be ordered.